# Smith *v.* The State.

## *Indictment for Murder.*

1. *Conviction of murder in second degree.*—Under an indictment for murder, if the defendant is found guilty of murder in the second degree, he can not, on another trial, be convicted of the higher offense.

2. *Contents of bill of exceptions.*—The volume of the bill of exceptions in this case, setting out the testimony of all the witnesses in full, with many substantial repetitions, is commented on, and condemned, as imposing unnecessary labor on the court, and subserving no useful purpose; and general rules are stated, as to what should be recited in the bill of exceptions, to authorize the revision of rulings as to the admissibility of evidence, or charges given or refused.

3. *Constituents of murder in first or second degree.*—Every homicide, committed with malice aforethought, is not necessarily murder in the first degree. Of the four classes of homicides which are declared by the statute to constitute murder in the first degree, one is defined to be any "willful, deliberate, malicious, and premeditated killing" (Code, § 4295); each of which qualifying adjectives is an essential part of the definition, and all should be employed in instructing the jury, since an unlawful killing which does not fall within the exact definition, but rises above the grade of manslaughter, is murder in the second degree.

4. *Same.*—If life be taken unlawfully, by a blow intentionally given, with an instrument calculated to produce death, and this blow be not the immediate, unpremeditated result of an assault (or assault and battery) inflicted on the slayer, and be not a necessary means of protection against an assault calculated to produce death or grievous bodily harm, such killing is murder; but, if it be wanting in any one or more of the qualities of willfulness, deliberation, malice and premeditation, as those statutory terms have been defined by the decisions of this court, it is murder in the second degree.

5. *Charge as to constituents of manslaughter.*—A charge instructing the jury that "manslaughter is the voluntary killing of a human being without malice," is faulty, since the killing must have been unlawful as well as voluntary.

[Smith v. The State.]

6. *Charge as to justifying provocation.*—A charge instructing the jury that "no amount of provocation will justify the taking of human life," is calculated to mislead them, since, if danger to the accused was imminent, threatening him with loss of life, or with grievous bodily harm, and he had no other mode of escape, he might lawfully slay his assailant.

7. *Charges on different aspects of case.*—When the evidence adduced, on a trial under an indictment for murder, shows the transaction in two very different phases. it is for the jury to determine which is the true one; and it is the duty of the court to declare the law on each phase of the case, not ignoring the evidence on any point because he may regard it as weak or inconclusive.

FROM the Circuit Court of Perry.

Tried before the Hon. GEORGE H. CRAIG.

The defendant in this case, Shadrach Smith, was indicted for the murder of Cato Lowery, "by striking him with a hatchet," or, as alleged in the second count of the indictment, "by cutting him with a hatchet." The trial was had on issue joined on the plea of not guilty, and resulted in a verdict and judgment convicting the defendant of murder in the second degree, and sentencing him to imprisonment in the penitentiary for forty years. On the trial, the defendant reserved a bill of exceptions to various rulings of the court, which purports to set out "in substance all the evidence adduced," using the language of the several witnesses in the first person, and covering eighty pages of the transcript. The decision of this court renders it unnecessary to give a statement of the evidence in detail, or to notice the several rulings to which exceptions were reserved.

The killing occurred in September, 1879. The defendant and the deceased, both freed-men, were at the time working as carpenters, with one George Brown, in the erection of a warehouse in Uniontown. A practicing physician, who examined the body of the deceased soon after his death, and who was examined as a witness for the prosecution, "testified, that he found the throat of the deceased had been cut with some sharp instrument, perhaps a hatchet; that the wound was an incised one, commencing under and behind the left ear, extending in a downward direction, and severing the carotid artery, the jugular vein, and the windpipe; that the death of said Lowery resulted from said blow, and must have resulted shortly after the blow;" and he further testified that, "in his best judgment, from the direction of the wound, the person striking the blow was below the person stricken." George Brown, a witness for the State, who was working with the defendant and the deceased at the warehouse, thus testified as to the circumstances attending the killing: "After dinner, about half past three o'clock, I sent Shadrach and Cato to

[Smith v. The State.]

put up some braces. Shadrach was up on the ladder, putting up the braces, and Cato was handing them up to him. They went to Milly Gilbert's fence, for some water; and as she was handing a pitcher of water over the fence to them, Shadrach took the pitcher first, and remarked that it was good to drink at another man's expense. They then came back to fixing the braces, and commenced quarreling. I told them, if they were going to quarrel, they had better separate, and let one lay the floor (in the north-west corner of the building), while the other fixed the braces. I then left the warehouse, and went to a lumber pile about fifty yards on the south side of the same; and while I was there, I heard them quarreling in the warehouse. I took up a piece of lumber, and went back into the warehouse; and just as I stepped up into the door, I saw Shadrach and Cato at the end of the work-bench. Shadrach had his hand drawn back, with his hatchet in his hand. I did not see the blow struck. When I first saw Shadrach, he was drawing his hand back, as if it was just coming from Cato's throat; and a sluice of blood was running from his throat, as big as my arm. He drew his hand back, let it fall by his side, and the hatchet dropped on the floor. Cato had his hatchet in his right hand, hanging by his side. He staggered to the door, and fell, while Shadrach ran off. When I first saw them, they were within three feet of each other. They were near each other, when I saw Shadrach step or spring back from Cato; and he drew the hatchet back from Cato, and held it in front of himself. Shadrach's hatchet was very sharp. I examined it after the man was killed, and it was sharp and very bloody. There was no brick in the house, that I saw. There was a trench in the house, on the ground, two feet apart from the bench. I did not notice to see if any one had scuffled near the trench. I saw Cato when he fell out of the door; he had hold of his hatchet about the middle of the handle, and was holding it down."

The defendant introduced evidence impeaching the testimony of this witness, by proof of his declarations when examined before the coroner's jury on the inquest, to the effect that he did not see any part of the difficulty—" only saw Cato falling out of the door, and Shadrach running off." Milly Gilbert, another witness for the prosecution, thus testified; "I did not see anything till they came to the door quarreling. Shadrach said to Cato, ' You've been drunk all day, and I'll stave my hatchet through you.' Lowery put his hand to his head, and I told Shadrach, ' Don't strike Uncle Lowery.' They then walked back into the warehouse, and I saw Shadrach strike the lick. He hit Cato with his hatchet, which he

had in his hand all the time. Lowery had no hatchet when I first saw him, but he stepped back and got it, and he had a brick in one hand. He had his hatchet up near the eye, and by the handle. I did not see him strike Shadrach at all; but, when he was cut, I saw him put up his hand to his throat, and threw the blood off with his hand. * * * I could not see Shadrach all the time on account of the weather-boarding of the warehouse, but I could see him every once and awhile as he and Lowery walked side by side. When they got to the middle of the warehouse, I could see them both plainly; and I saw Cato's hatchet and brick in his hands all the time. He went nearly to the work-bench with the brick in his hand, holding it up, but never threw it at, or struck Shadrach. When he threw his hand to his throat, there was no brick in it." Evidence was introduced on the part of the defendant tending to impeach the testimony of this witness, by proof of her declarations that she did not see the difficulty, and also by proving that she could not have seen it while standing in the door of her house.

It was shown that the defendant, when he ran off after the killing, ran about one hundred yards, and then turned back, and surrendered himself to one Hudson, who had pursued him. Hudson was examined as a witness for the State, and testified, among other things, that when he caught hold of the defendant, the latter declared that he had acted in self-defense; also, "My best recollection is, that when he was brought back he said, ' *Cato called me a damned son of a bitch, and then I struck him.*' I can't say that he said this was the reason that he killed Cato. He said these words, and was saying a good many other things, and was claiming and explaining that he did it in self-defense." Joe Clark, a witness for the defendant, testified that he was throwing off a load of wood for Milly Gilbert when the difficulty began, and saw Shadrach and Cato putting up the rafters in the warehouse; that Cato spoke to him, and asked him to haul a load of wood, and while they were talking Shadrach called out, from the top of the ladder, "*Cato, God damn it, if you a'int going to hold it right, go away from here, and I'll hold it myself;*" that Cato then stepped backwards, with the uplifted pole in his hands, saying, " *Don't curse me,*" or words to that effect, and continued to repeat them, until Shadrach said, " *If you wasn't drunk, I'd give you a good beating this evening;*" that Cato then said " *If you curse me, and say that I am drunk, I'll kill you,*' and stepped off a few feet, and picked up his hatchet and a brickbat; that defendant, saying, '*If you wasn't drunk, I'd whip you,*' began to walk away from the deceased, who followed him, with his hatchet in his left hand

and the brick in his right, saying, ' *You curse me,*' '*You say I'm drunk,*' and threw the brick just as the defendant got close to the trench and the corner of the bench; it struck the defendant in the back, and he tripped and fell just across the trench; and just as he was rising, the deceased had gotten over him, with his hatchet raised in his hand, when the defendant struck with his hatchet; Cato dropped his hand as the blow was struck, turned around, staggered to the door, and fell, while the defendant ran off."

Numerous exceptions were reserved by the defendant to the rulings of the court on questions of evidence, which require no special notice; and also to specific portions of the affirmative charge given by the court, most of which are copied in the opinion of the court. Thirty charges in writing were asked by the defendant, and refused by the court, and exceptions were reserved to their refusal. All these rulings, the material portions of which are set out in the opinion of the court, are now urged and relied on as error.

E. M. VARY, for appellant.—1. When the facts and circumstances attending a killing are in evidence, the presumption must be drawn from the whole evidence, and not from the nature of the weapon only.—*Eiland v. The State*, 32 Ala. 332.

2. The burden of proof as to malice is not shifted from the State to the defendant, when it is shown that the killing was with a deadly weapon.—*Ogletree v. The State*, 28 Ala. 693. Wharton on the Law of Homicide, sections 656-659, 677; *Murphy v. The State*, 37 Ala. 146; *Mitchell v. The State*, 60 Ala. 30; *Hadley v. The State*, 55 Ala. 37. 3. The definition of murder as given by the court is incorrect.—*Mitchell v. The State*, 60 Ala. 30. 4. The court erred in charging the jury that if the defendant brought on the difficulty he would be guilty of murder in the first degree. It is true that, if a person brings on a difficulty *for the purpose* of wreaking his vengeance or killing, he is guilty of murder; yet he may provoke a difficulty with no such intention, and while the law would not hold him guiltless, yet he might be guilty of voluntary manslaughter only.—*Mitchell v. State*, 60 Ala. 32; *Hadley v. State*, 55 Ala.; *Ex parte Nettles*, 58 Ala. 268. 5. The killing of a human being voluntarily and without malice may, under certain circumstances, be excusable; as where the killing was done in self-defense. To constitute manslaughter, the killing must be unlawful as well as intentional or voluntary.—*McManus v. The State*, 36 Ala. 291; *Mitchell v. The State*, 60 Ala. 32. 6. The Circuit Court should have given many of the charges asked by defendant. A mere perusal of these

[Smith v. The State.]

charges will convince the court that they ought to have been given.

H. C. TOMPKINS, Attorney-General, contra.

STONE, J.—The accused, having been convicted of murder in the second degree, can not, on another trial, be convicted of a higher grade of homicide.—Bell v. The State, 48 Ala. 684. In many carefully considered cases, we have discussed and declared the various grades of criminal homicide, as classified by our statutes, and we do not deem it necessary to enter again on any general discussion of the subject. McManus v. The State, 36 Ala. 285 ; Fields v. The State, 52 Ala. 348 ; Ex parte Nettles, 58 Ala. 268 ; Judge v. The State, Ib. 406 ; Mitchell v. The State, 60 Ala. 26 ; Boswell v. The State, 63 Ala. 306 ; Brown, Ex parte, 65 Ala. 346.

We feel it our duty to notice and condemn the volume the record in the present case is made to assume. All that is material could have been brought before us in a much smaller compass, and thus have relieved us of much labor in reading details by various witnesses, often repeating substantially what had been previously testified to by other witnesses. A further reason. The weight or sufficiency of evidence to justify a conviction, or demand an acquittal, is, under our system, a question for the jury, with which we have nothing to do, further than to declare rules of law. All that need be stated, in raising questions on charges refused, is that there was testimony tending to support the hypothesis of the charge. So, on the question of the admissibility of evidence, the inquiries are, does it shed light on the issue ? is it pertinent ? is it legal? Sometimes the testimony offered is so directly connected with the issue, that its admissibility stands self-asserted. The pertinence of other testimony depends on something which has gone before, or is to accompany it. In presenting questions as to the admissibility of evidence of the latter class, it is only necessary to state enough to show its relevancy. Beyond this, anything stated is a needless incumbrance. So, when a question has been once raised and reserved, it can not be necessary to raise the same question a second time. If testimony is erroneously admitted or excluded once, the judgment will be reversed. It can only be reversed, if such erroneous ruling has been made more than once. In what we have said, we have reference to a too prevalent fault, which does not apply to this case more than it does to many others.

In Mitchell v. The State, supra, we defined what constitutes murder in the first degree under our statute. It is not

[Smith v. The State.]

every killing with malice aforethought which rises to the bad eminence of murder in the first degree. One class is defined as a "willful, deliberate, malicious, and premeditated killing." In defining that class to juries, each and all of the qualifying adjectives should be employed; for, unless the killing fall precisely within one of the classes enumerated in section 4275 of the Code, and therein denounced as murder in the first degree, it is murder in the second degree, manslaughter, or excusable homicide.—*Judge v. The State, supra.* Hence, every unlawful killing, which does not fall precisely within one of the defined classes of murder in the first degree, and yet rises above the grade of manslaughter in the first degree, is murder in the second degree. If life be taken unlawfully, by a blow intentionally given, with an instrument calculated to produce death, and this blow be not the immediate, unpremeditated result of an assault, or assault and battery inflicted on the slayer, and be not a necessary means of protection against an assault calculated to produce death, or grievous bodily harm, this is murder. But, if it be wanting in any one or more of the qualities of willfulness, deliberation, malice, premeditation, as we have defined those phrases, it will be murder in the second degree.—See *Ex parte Brown,* 65 Ala. 446. Under these rules, the following portions of the general charge were faulty and incomplete, and should not have been given : "If the jury should find, beyond all reasonable doubt, under the law as stated to them, that the defendant killed Cato Lowery with malice aforethought, and that the killing occurred in this county before the finding of the indictment, it would be their duty to find him guilty of murder in the first degree."

"Manslaughter is a voluntary killing of a human being without malice." (Must have been unlawful as well as voluntary.) "No amount of provocation will justify the taking of human life." (Calculated to mislead—because, if danger to accused was imminent, threatening him with loss of life, or grievous bodily harm, and he had no other mode of escape, then he could slay his assailant. But, if this stood alone, we would not probably reverse. Tendency to mislead is not ground for reversal.)

Many of the charges asked should have been given. We specify the following : "If the jury have a reasonable doubt, generated by all the evidence in this cause, as to whether the defendant acted in self-defense or not, then they should acquit."

"In this cause, the burden of proof is not shifted from the State to the defendant, and the presumption of innocence abides with the defendant until all the evidence in the cause
VOL. LXVIII.

[Smith v. The State.]

convinces the jury, to a moral certainty, that the defendant cannot be guiltless."

"In a criminal cause, when the evidence, whether introduced by defendant or State, establishing the killing, also shows the matters in justification or excuse, the burden of proof is not thereby shifted from the State upon the defendant, and it does not devolve upon the defendant to prove to the full satisfaction of the jury the matters in justification or excuse before they can acquit; and it is sufficient to authorize an acquittal, that the jury have a reasonable doubt from all the evidence of the guilt of the defendant."

"If the jury believe from the evidence that Cato Lowery struck Shadrach Smith with a brick just as he was upon the edge of the trench, or ditch, and that Shadrach then tripped and fell across the trench, and that just as he was rising upon the other side of the trench, the deceased was standing over him with a lifted hatchet, the defendant not having brought on the difficulty, then they are authorized to presume that Shadrack struck in self-defense, and should acquit him."

"If the jury believe from the evidence that a hatchet and two-thirds of a brick are deadly weapons, and that the deceased was attacking the defendant with either or both of these weapons, sufficiently near to have inflicted upon him grievous bodily harm—the defendant retreating and doing nothing to provoke the assault—then the jury should acquit the defendant."

"It is the duty of the jury to attempt to reconcile conflicting testimony, but if, upon an examination of all the evidence in this case, they find it so conflicting as to leave upon their minds a reasonable doubt as to the guilt of the prisoner, then they must acquit."

"If the jury believe from the evidence that deceased left the place where he was ordered to lay the floor, and followed the defendant across the warehouse, and struck him with a brick, or two-thirds of a brick, just as he was crossing the trench, and that defendant fell upon the opposite side of the trench, defendant not having brought on the difficulty, and just as he rose deceased was standing over him with an uplifted hatchet, or with his hatchet held in a menacing manner, and that defendant struck under a reasonable belief that he was in imminent danger of great bodily harm, the jury ought to acquit the defendant."

"If the jury believe from the evidence that Milly Gilbert is contradicted on material points, such as by the shape and direction of the wound, and other evidence in this cause, then this may be sufficient to raise a reasonable doubt in the minds of the jury of the truth of this witness' testimony."

[Jeffries v. Castleman.]

"Proof of contradictory statements, declarations, or testimony, on material points, made by the witness George Brown, may be sufficient to raise a reasonable doubt in the minds of the jury, of the truth of this witness' testimony."

There are probably other errors in the charges given and refused, but we deem it unnecessary to point them out.

The testimony in this record shows the transaction in two very different phases. It is for the jury to determine which is the true one. It is the duty of the presiding judge, on another trial, to declare the law to the jury on each phase of the facts, which the testimony tends to establish. No matter how weak, or inconclusive, the presiding judge may himself regard the testimony on any given question, he can not ignore it in his charge. He judges only of its relevancy, not of its weight. The jury, under the rules of law, are the sole judges of the credibility and weight of the testimony.

The remaining questions raised by the record, will not, probably, arise again, in the form in which they are now presented, and we will not consider them. In some of the questions put to witnesses, the court probably ruled erroneously. We mention only one—the answer given by the witness, Dozier, as to what he, the witness, had said to the accused, when the latter picked up the hatchet of deceased. This answer should have been disallowed.

The judgment of the Circuit Court is reversed, and the cause remanded. Let the defendant remain in custody, until discharged by due course of law.